Kehr v. Stauf.

---

PETER KEHR, Appellant, *against* GEORGE A. STAUF, Respondent.

(Decided May 18th, 1883.)

In an action between copartners for a dissolution of the copartnership and an accounting, where the principal issue was as to the respective shares of the parties, under the copartnership agreement, in the profits of the business, it appeared that the agreement was oral, and plaintiff and defendant, the sole witnesses to it, contradicted each other. Plaintiff, however, was corroborated by written admissions made by defendant, in a letter from him to plaintiff, that his account had been largely overdrawn, which, while plainly consistent with plaintiff's testimony, were wholly irreconcilable with the testimony and claims of defendant; and it further appeared that defendant had, without plaintiff's knowledge and without authority, issued notes in the firm name to a large amount which he had used for his own private purposes, to secure an antecedent individual debt, and in stock speculations and betting. *Held,* that defendant's testimony ought to be rejected as unworthy of belief, and a judgment entered upon the report of a referee in his favor should be reversed upon appeal.

APPEAL from a judgment of this court entered upon the report of a referee.

Kehr v. Stauf.

The action was brought for a dissolution of copartnership and an accounting. The facts are stated in the opinion. From the judgment entered upon the report of the referee by whom the action was tried, the plaintiff appealed.

*B. F. Watson*, for appellant.—In an appeal from the judgment entered upon the report of a referee, the whole question of the weight of the evidence is before the General Term, and it is its duty to take the responsibility of examining the evidence and determining the facts for itself. And when, as in the case at bar, any portion of the evidence is in writing, as, for instance, books, letters, or documents, the appellate court is under no obligation to be influenced by the referee's conclusions from such writings, as the consideration due to the fact that the referee has personally seen the manner and appearance of the witnesses, does not hold in the case of writings (Code Civ. Pro. § 1346; *Godfrey* v. *Moser*, 66 N. Y. 250; *Dickson* v. *Broadway & Seventh Ave. R. R. Co.*, 47 N. Y. 507; *Finch* v. *Packer*, 49 N. Y. 1; *Smith* v. *Etna Life Ins. Co.*, Id. 211; *Mazetti* v. *New York & Harlem R. R. Co.*, 3 E. D. Smith, 98; *Monell* v. *Marshall*, 25 How. Pr. 425; *Arnoux* v. *Homans*, Id. 427; *Quincey* v. *Young*, 5 Daly 327; *Hynes* v. *McDermott*, 9 Daly 4; *Wright* v. *Hunter*, 46 N. Y. 409; *Ellis* v. *Howe Machine Co.*, 9 Daly 78; *Bigler* v. *Barnes*, 56 N. Y. 654; *St. Luke's Home for Indigent Christian Females* v. *Association for Relief of Respectable Aged Indigent Females*, 52 N. Y. 191; *Talbot* v. *Arnold*, 61 N. Y. 616; *Parker* v. *Baxter*, 86 N. Y. 595).

*Albert A. Abbott*, for respondent.—On appeal from a judgment entered upon the report of a referee the court will not disturb the finding of the referee upon a disputed question or issue of fact, if it appears that there was any testimony tending to support the finding, unless there is a clear preponderance of evidence against the finding, and such as to evince that a palpable error has been committed, or that the

Kehr v. Stauf.

referee was actuated by improper motives or guilty of misconduct (*Mazetti* v. *New York & Harlem R. R. Co.*, 3 E. D. Smith 98; *Quincey* v. *Young*, 5 Daly 327, aff'd *Quincey* v. *White*, 63 N. Y. 370; *Foster* v. *Coleman*, 1 E. D. Smith 85; *Ellis* v. *Howe Machine Co.*, 9 Daly 78; *Monell* v. *Marshall*, 25 How. Pr. 425).

J. F. DALY, J.—The principal issue of fact in this case is, whether the parties were to share equally in the profits of the business, or proportionately to the capital each contributed. The referee has found that the copartnership agreement was that the profits were to be equally divided. This agreement was not in writing, and the plaintiff and defendant, the sole witnesses to it, contradict each other. Where the determination of the issue depends upon the credibility of the witnesses the General Term is not disposed to disturb the decision of the referee (*Quincey* v. *Young*, 5 Daly 335, 338; *Ellis* v. *Howe Machine Co.*, 9 Daly, 79; *Monell* v. *Marshall*, 25 How. Pr. 425; *Mazetti* v. *New York & Harlem R. R. Co.*, 3 E. D. Smith 102).

In this case, however, we are referred to a written admission by defendant as a corroboration of plaintiff's testimony, and to other circumstances in support of his version of the agreement. While alleged verbal admissions of a party are regarded as the weakest kind of evidence, his admitted written declarations make evidence of the strongest kind against him. In *Molloy* v. *New York Central &c. R. R. Co.* (10 Daly 453), we ordered a new trial in an action tried before a jury, because the party in interest had made a written statement prior to the trial, which contradicted his evidence on the stand. In that case we adopted the view of the court in *Boyd* v. *Colt* (20 How. Pr. 384), where the plaintiff swore one way and the defendant another, and a letter of plaintiff was produced and read in evidence wherein he admitted facts showing the truth of defendant's version of their agreement; and it was held by the General Term of the Supreme Court that the letter unexplained was conclusive against the plaintiff, and that the jury were bound

to disregard his oath when flatly contradicted by his own letter written long before the action was commenced.

In this case the plaintiff produced a letter written to him by defendant on December 13th, 1879, a month before the commencement of this action, which is brought to have the copartnership decreed dissolved and for an accounting. Its significance will be seen by a brief statement of the copartnership dealings. The defendant was the son-in-law of plaintiff, and had been taken into partnership by him on January 1st, 1877. The plaintiff at that date had dissolved his former firm of Kehr, Kellner & Co., taking the assets and assuming the liabilities of the old concern. The business carried on by them was the manufacture of furniture. When the new firm with defendant was formed on January 1st, 1877, the books showed a total gross capital of $196,-800.25, subject to the liabilities of the old firm $86,817.28, leaving a net capital of $109,982.97, of which $99,982.97 was contributed by plaintiff, and $10,000 was contributed by defendant. The defendant did not contribute in fact more than $500 in cash. The balance of his capital was made up for him by plaintiff. How it was made up is of no consequence in determining the issues in the case, beyond the fact that it was actually a gift or a credit to defendant from his father-in-law, the plaintiff. Defendant alleges that plaintiff gave his daughter (defendant's wife) $5,000, in order that she might lend it to defendant to be contributed as capital. Plaintiff alleges that he gave the $5,000 to defendant out of his own assets. The other $5,000 was made up by a credit on the books as upon a note of defendant for $4,500, and by defendant's aforesaid contribution of $500 in cash. Defendant was thus enabled by plaintiff to make up a capital of $10,000 as against plaintiff's capital of $99,982.83. Plaintiff's version of the agreement is that this arrangement was made in order that defendant might draw profits on that amount of capital. Defendant swears that the agreement was that the profits were to be equally divided.

It may be said here that this arrangement corroborates

plaintiff's version of the agreement.   If profits were to be equally divided there was no necessity for making up ficti- tious capital for defendant at the precise sum of $10,000. It was only necessary to make the agreement for equal shares.   The making up of a nominal capital at a particular amount would seem to have been designed as a basis for computation of profits.   By the copartnership agreement the plaintiff was to draw $4,000 per annum, and the defend- ant $2,000 per annum as salary, before profits were divided. The profits for the year 1877 were $24,557.03.   In the early part of January, 1878, a balance sheet was prepared by the bookkeeper of the firm, showing the plaintiff credited on the books with $22,324.54 of these profits, and defendant credited with only $2,232.49.

This balance sheet was shown to defendant.   He says that he took it to plaintiff and told him that the book- keeper had made a mistake in crediting the plaintiff with nine tenths of the profits and himself with one tenth ; that plaintiff replied that he had given no orders on the subject, and the bookkeeper, not knowing their agreement, had prob- ably followed the custom of the old firm, giving each part- ner profits in proportion to his capital ; that defendant said it was not right, he had better have it changed, and have one half of the profits credited to him ; that plaintiff said it was no matter, ·they knew what their agreement was ; that defendant said he only wanted it understood that it was not right, and that he was entitled to half the profits ; that plaintiff then said if defendant had no confidence in him he would have the books changed ; that defendant answered he was satisfied, he preferred to have it as it was, and had every confidence in him.   Nothing more was said. The books were not changed.   The profits of the year 1878 were $2,948.91.   In January, 1879, a balance sheet was made up by the bookkeeper showing that the plaintiff was credited on the books with $2,727.76 of that amount, and the defendant with $221.15.   This balance sheet was handed at the time to defendant.   He says that he told plaintiff a few days afterwards that he noticed that the bookkeeper

had credited the profits the same way as before; that plaint-
iff said he would speak to the bookkeeper and tell him to
credit them equally with the profits. The books were not
changed. In September, 1879, according to the defendant's
testimony, he had a conversation with plaintiff in which
he claimed that his profits for the last two years and a half
were much more than he had drawn, and plaintiff did not
deny the fact, but said that the profits would have to re-
main in the firm.

The plaintiff denies that these alleged conversations took
place. He swears that when the balance sheets were deliv-
ered each year to defendant the latter took them home to
examine and returned them without objection. The fact
that balance sheets were so handed to defendant and the
books show no alteration of the per centage of profits cred-
ited to defendant during the whole period of the copartner-
ship, is strong corroboration of plaintiff's version of the
copartnership agreement. It is difficult to conceive defend-
ant permitting his account on the books to be balanced each
year upon such a basis if it were a false one.

In the year 1879 the defendant, as he expressly admits in
his answer, became addicted to the vice of gambling, and
withdrew from the copartnership large sums of money
amounting to about $7,000; he also executed and delivered
in the name of the copartnership, but not for its benefit nor
in the course of its business, but for his own purposes, three
promissory notes amounting in the aggregate to the sum of
$13,915.60. One of these notes was made October 2d,
1879, for $5,875, one on October 9th, 1879, for $4,840.60,
and one on November 27th, 1879, for $3,200. Defendant,
by December 13th, 1879, had drawn from the concern in
cash $11,444.73, viz: $1,507 in 1877, $3,093.05 in 1878, and
$6,844.68 up to December 13th, 1879.

If his share of the profits were one half, his total drafts
in money would not have amounted to what he was actu-
ally entitled to draw from the firm in cash, for his account
at the end of December, 1879, would have stood as follows:

Kehr v. Stauf.

| | | |
|---|---|---|
| Half profits for 1877, 1878, 1879 . . | $14,766 | 28 |
| Salary for same period . . . | 6,000 | 00 |
| | $20,766 | 28 |
| Total drafts in money . . . . | $12,193 | 28 |
| Balance to his credit . . . . | $ 8,573 | 00 |

If on the other hand he had been entitled to share in the profits according to his proportion of capital, his account at the same date would have stood as follows:

| | | |
|---|---|---|
| Share of profits for 1877, 1878, 1879 . | $ 2,684 | 77 |
| Salary for same period . . . . | 6,000 | 00 |
| | $ 8,684 | 77 |
| Total drafts in money . . . . | $12,193 | 28 |
| Overdrafts . . . . . | $ 3,508 | 51 |

This being the comparative state of matters at the time, the defendant then made the written admission which has been referred to, in the shape of a letter dated December 13th, 1879, written and sent by him to the plaintiff, and which is as follows:

"December 13th, 1879.

"Dear Father:—I believe it would be only an act of justice due to you by myself to candidly inform you by letter of what I sincerely regret and honestly confess, I am personally ashamed to tell you to your face. My account has been largely overdrawn this year, and think you should be made acquainted with the reasons for my heavy expenditure. I began the year by paying all my outstanding bills, and considered myself free from debt. But in an unhappy hour I was tempted by some of my companions to visit out of curiosity one of the so-called 'club houses.' While there I was enticed to join in a friendly game of cards, and, unfortunately, won a large sum of money. I subsequently visited this club house, and at various times gambled and lost very heavily. In order to retrieve my losses, I have vainly struggled from time to time to win back and make my losses

good, but only succeeded in sinking myself deeper and deeper. I have paid off all this indebtedness with the exception of one debt of $120, after which I am a free man again. My misery and grief during this period was greater than can be confessed to you. I bore a smiling face in the office, which taxed my courage, but my heart was sore and sad, and to such an extent that it affected my health. I beg of you to grant me your forgiveness for this unbusinesslike behavior, promising that if you will overlook and pardon my bad conduct this year that I will turn over a new leaf and become a different man in the future, attending closer to my business, and seeking in every way by industry and fidelity to business in 1880 to partly make up my deficiencies in this respect this year. I have received a terrible lesson from associating with evil companions, and it will be a sad warning to me to beware of them in future. Everything I possess I owe to your kindness and generosity, and it stings me with remorse to see and feel how I have abused it. I acknowledge my fault, and personally appeal to you from my heart to make me a happy son once more by granting me your forgiveness, allowing me another chance to regain your lost favor and confidence, solemnly promising to cut loose and avoid all my former companions, to return and be economical in my personal and household expenses, be very attentive to business, and endeavor to do all that lays in my power to merit your forgiveness. GEORGE."

This letter seems to be irreconcilable with the position of a man who, at the time of writing it, had $8,573 of unused profits to his credit in the concern, but is plainly consistent with his condition if he had overdrawn his account $3,508.51, or to any large amount. The version of the agreement as to profits which plaintiff gave would show defendant's account to be overdrawn; the letter expressly admits that his account is *largely overdrawn;* and on the question of fact this letter, unexplained, ought to be deemed conclusive evidence of the truth of plaintiff's testimony, upon the authority of the cases cited.

As between plaintiff and defendant on the question of

o

veracity, the referee has seen fit to give credit to the latter, in the face of the above letter, and in the face of the undisputed fact that defendant, without the knowledge of his copartner, and without authority, issued notes in the firm name to the amount of nearly $14,000 for his own private purposes; one being used in stock speculations, one to secure an alleged antecedent debt to his father, and one being used to gamble with at horse races. The testimony of a party who would attempt to rob the copartnership in that manner needs, in my opinion, strong confirmation to justify its acceptance where it is merely contradicted by another witness; but where it is contradicted by his own writing it ought to be rejected as unworthy of belief.

The judgment should be reversed and a new trial ordered, with costs to abide event.

VAN BRUNT and VAN HOESEN, JJ., concurred.

Judgment reversed and new trial ordered, with costs to abide event.