CHICAGO, ROCK ISLAND & PACIFIC RAILWAY CO. vs

DRIGGERS.

Opinion delivered April 2, 1898.

1. *Railroad Trains—Negligence.*

Appellee was a passenger on one of appellant's freight trains.
The train was composed chiefly of loaded cattle cars. The
third car forward of the caboose jumped the track, derailing
the train, and causing the injury complained of by appellee.
The train was run at the rate of forty miles an hour. The
car which jumped the track was an empty refrigerator car.
There was testimony that such car was as heavy as an ordinary
passenger coach, and that first-class roads some times had
such cars in passenger trains. *Held*, That no negligence of
the part of the railroad company is shown by having such car
in the said train, and in the place where it was.

. *Duty of the Court to Direct Verdict.*

> Where the evidence is such that the court must set aside a verdict and grant a new trial, if a verdict should be rendered for the plaintiff, it is the duty of the court to take the case from the jury and direct a verdict for the defendant.

Appeal from the United States Court for the Southern district.

C. B. KILGORE, Judge.

Suit for damages for personal injury by J. F. Driggers, against the Chicago, Rock Island & Pacific Railway Co. Judgment for plaintiff. Defendant appeals. Reversed.

This action was commenced at Chickasha on August 22, 1896, by appellee, to recover of appellant $15,000 for personal injuries, $50 for medical care and $72 for loss of time, on account of injuries received by appellee while being carried on one of appellant's stock trains in Kansas on the 17th day of the same month. The complaint charges that appellant, on said 17th day of August, entered into a contract with appellee to haul two car loads of cattle from Chickasha to Union Stock Yards, at Kansas City, Mo.; and furnished appellee transportation to Kansas City and return, for the purpose of looking after said cattle; "that while in transit, and in charge of said cattle, on defendant's road, about 15 miles north of Wichita, Kansas, said defendant, through its agents, servants and employes, operated and ran the train, upon which the said cattle and the plaintiff herein were being carried and hauled, in such a careless and negligent manner, and at such a great rate of speed, thereby endangering the life and safety of the plaintiff; and that by reason of the negligent and careless manner in which the defendant, by its servants and employes, constructed its cars, and the

negligent and careless manner in which they arranged the cars of said train, wherein they attached an empty to the rear end of said train, causing the same to fly the track and break loose from the main train, together with the caboose in which the plaintiff was riding, causing the caboose to violently overturn, breaking and dislocating the plaintiff's left clavicle from the sternum, and fracturing and breaking the left two-thirds of left clavicle of the plaintiff, near the shoulder joint, also bruising and injuring plaintiff's left elbow, causing the plaintiff great pain, suffering, and mental agony, and rendering him permanently injured, to his great damage, in the sum of fifteen thousand dollars ($15,000).' The contract is made a part of the complaint. It is therein stipulated that the two cars of cattle are ''to be loaded and unloaded, watered and fed by the said J. F. Driggers, or his agents, and in consideration of free transportation for one person, hereby given by said railway company, such persons to accompany the stock; that the persons who receive free transportation in charge of said stock, in consideration of the receipt of the same, agree to assume all risk of personal injury from any cause whatever, except injuries from gross carelessness of the railway company." Appellant answered on September 9, 1896, and admitted jurisdictional matters alleged in the complaint, and the execution of the the contract, and averred that appellee, at the time of the alleged injuries, was being carried on appellant's freight train under said contract, and that the alleged injuries were not the result of gross negligence on its part. It denied that the injuries were of the kind alleged, and denied that they were caused by, or the result of, any negligence or carelessness on its part. On the trial the appellee, his father and the witness Harness, appellee's employe, testified that they were all on appellant's freight train, accompanying stock to Kansas City, and when they got beyond Wichita, and while train was running at from 40 to 60 miles per hour as stated

by the father, and at from 40 to 45 miles an hour, as stated by Harness, an empty refrigerator car, the third one from the caboose, left the track, causing the caboose to also leave the track and overturn, resulting in the breaking of apppellee's collar bone and bruising his elbow, compelling him to keep his bed two to four weeks, and preventing him from working for six weeks or two months. Appellee further testified that his left shoulder still (five and two thirds months after the injury) hurt him when he lay on it of nights, and that he did not have good use of his arm about lifting anything; that he was in the stock business, and his time was worth $1 to $1.50 per day; and that he had to pay $35 in doctor bills. Appellant, defendant below, introduced as witnesses its division superintendent, its general foreman of motive power and equipment, or master mechanic, and the conductor, engineer and brakeman, all of whom were on the train in question, and who had had from 7 to 24 years experience in railroading; and also introduced its car inspector, who inspected the car and train at Caldwell before the accident, and also the inspector who inspected the car after the accident; and also introduced its road master and section foreman. As to the condition of the track at or near the place in question, appellee announced that he would abandon all claim that it was negligently constructed or maintained. It was shown to have been level and in first-class condition in every respect, and suitable for trains to run over with safety at 50 or 60 miles per hour. As to the condition and construction of the car that left the track and caused the accident, the inspector testified that it was in first-class condition when it passed Caldwell, before the accident. After the accident it was carefully looked over by the train crew, the road master, the superintendant, and master mechanic, and none of them were able to detect anything defective about it, or anything that would tend to cause it to leave the track; and the superintendent and mas-

ter mechanic had it carefully inspected by a competent
inspector, after the accident, with proper appliances and
tools, and nothing was found defective about it that would
tend to cause it to leave the track. It was shown to have
been constructed specially for fast running, carrying perish-
able freight, very heavy, weighing some 36,000 pounds, and
that such cars—refrigerator cars—empty or loaded, were
frequently placed in passenger trains by first-class roads.
As to the arrangement of the train, all these witnesses who
testified on that point testified that the train was properly
arranged. As to the speed of the train at the time of the
accident, the superintendant, master mechanic, and three of
the train crew, all of whom had had many years' experience
in such matters, testified that the train was running from 35
to 40 miles per hour, and the speed sheet introduced in evi-
dence showed that the train was running 40 miles per hour.
All of them testified that over that portion of the track, be-
ing in good condition, straight, and some down grade, a
speed of 50 or 60 miles per hour was considered safe. None
of the witnesses could give any cause for the car leaving the
track. At the close of the evidence appellant asked the
court to instruct the jury to return a verdict for it, but the
court refused to so direct the jury. Under the instruction
the jury returned a verdict for appellee, plaintiff below, for
$1,400. On the same day appellant filed its motion for a new
trial, which was overruled. Judgment was rendered on the
verdict. Appellant moved for an appeal to this court, which
was granted. A supersedeas bond, and also a bill of excep-
tions, were filed within the time granted by the court, and
appellant brings the cause to this court, and asks for a re-
versal of the judgment.

*John I. Dille* and *W. E. Clark*, for appellant.

1. Appellee failed to show any negligence whatever

upon the part of appellant, and the court should have instructed a verdict for the defendant. Railway Company vs Woodworth, 1 Ind. Ter. 20; Washington vs Railway, 36 S. W. 779; Schofield vs Railroad, 114 U. S. 615; Motey vs Pickle Company, 74 Fed. 155; Sipes vs Saymour, 76 Fed. 116.

2.  The court erred in charging the jury "that if they found that the defendant  *  *  *  was guilty of negligence in making up  *  *  *  said train, and that the injury to the plaintiff was the result of such neglect, it would be your duty to find for the plaintiff." There was no evidence to support the charge, and it is prejudicial error to charge the jury upon a state of facts concerning which there is no proof. Mich. Bank vs Eldred, 9 Wall. 544; Ins. Co. vs Stevens, 71 Fed. 258, 262; Railroad vs Houston, 95 U. S. 697, 703; Ky. Cent. Ry. vs Biddle, 35 S. W. 904; St. L. A. & T. Ry. vs Torrey, 58 Ark. 217; 24 S. W. 244; I. & G. N. Ry. vs Eason, 35 S. W. 208; Fergus vs Dodson, 33 S. W. 272.

*A. C. Cruce* and *Riddle & Payne*, for appellee.

1.  The witnesses who testified in regard to the speed of the train were competent. When the facts and circumstances are disclosed upon which the opinion is founded, it is competent for witnesses to give their opinion. Kelley vs McGuire, 15 Ark. 555; Abraham vs Wilkins, 17 Ark. 322; State vs Pike, 6 A. R. 549. Witnesses may be permitted to testify as to the rate of speed of a railroad train upon a certain occasion. Detroit vs Van Steinberg, 17 Mich. 99; Commonwealth vs Sturtivant, 19 A. R. 401; 62 Ark. 258; Bennett vs Meehan, 43 A. R. 78; State vs Folwell, 14 Ark. 105; Commonwealth vs Malone, 114 Mass. 295. The fact of the derailment of the train itself shows negligence upon the part of the railroad company. Albion Lumber Co. vs DeNobra,

(20)

19 C. C. A. 168; Seybolt vs Railroad Co., 95 N. Y. 562; 40 Ark. 298; Feltall vs Middlesex Railroad Co., 109 Mass. 720; George vs Railroad Co., 34 Ark. 613.

SPRINGER, C. J. (after stating the facts). The first error assigned by appellant in this case is that the court below refused to instruct the jury, as requested by appellant, that the plaintiff had failed to show that he received the injuries alleged in the complaint through the negligence or carelessness of the defendant, its agents, servants, or employes, and therefore that the jury should return a verdict for the defendant. Whether a motion should be allowed taking a case from the jury, and directing a verdict by the trial court, depends upon the evidence. The statement which precedes this opinion is taken substantially from the brief of appellant; but in the brief of appellee it is conceded that the facts as given above are substantially correct, and no suggestion as to a modification thereof is made. We will assume, therefore, that the facts disclosed by the evidence are as set forth in the foregoing statement. Appellee states in his brief that he does not rely upon any negligence in the construction of the cars, but solely upon the allegation of the "negligent arrangement of the cars in the train and the negligent and careless running of the train." We will consider these contentions separately.

First, as to the alleged negligent arrangement of the cars in the train: There were only two witnesses introduced by appellee besides himself. In appellee's testimony he made no statement in reference to the arrangement of the cars in the train. J. C. Driggers, appellee's father, stated that he thought the wreck was caused by an empty car jumping the track—a refrigerator car, which was taller than the other cars in the train—and that it was the third car from the caboose. I. H. Harness, who was an employe of

appellee to assist in transporting the cattle, testified, on behalf of appellee, that it was the third car from the caboose that jumped the track—an empty car, taller than the others; that the train was heavily loaded with cattle; but that he did not know what caused the wreck. It is conceded by appellee that the car which jumped the track and caused the accident was properly constructed. If there was any negligence on the part of the railway company, it was in coupling an empty car in a train loaded with cattle at the position in the train indicated, namely, the third car from the caboose. The testimony of appellant's witnesses, who were all railroad men, having had experience from 7 to 24 years in railroad matters, was to the effect that the car which jumped the track was a refrigerator car, fully as heavy in equipment as passenger cars, and that such cars are frequently carried with passenger trains on first-class roads and under first-class management. There was no conflict in the testimony on this point. It was conclusively established that the arrangement of the cars in the train was properly made, and certainly no negligence can be imputed to the railroad company on this account.

*Railroad Train—Proper Arrangement.*

The second contention of appellee is on account of the alleged "negligent and careless running of the train." It is conceded that the track was properly constructed and maintained; that there was no negligence in the construction of the cars; and we have shown that the arrangement of the cars in the train was in the usual manner, and free from any fault on the part of the railroad company. If there was any negligence or carelessness, it was in the speed of the train at the time of the accident. The superintendent, master mechanic, and three of the train crew all testified that the train was running from 35 to 40 miles an hour. Mr. Harness, one of appellee's witnesses, testified that it was running from 40 to 45 miles an hour; while the appellee's

father, who was on the train, testified that he thought i
was running from 40 to 60 miles an hour. But the spee
sheet, which was introduced in evidence, showed that th
train was running 40 miles an hour. All the witnesses fo
the railroad company testified that over that portion of th
track, being straight, in good condition, and slightly dow
grade, a speed of 50 or 60 miles an hour was considered safe
There was no conflict in the testimony upon the question a
to the rate of speed which was considered safe, under th
conditions stated. If there was any conflict, it was as t
the rate of speed at which the train was running. Th
highest rate stated was 60 miles an hour, which was th
opinion of appellee's father, who was not an expert in suc
matters. But, if the highest rate mentioned had been th
actual rate of speed, the evidence is not disputed that suc
rate would be safe. There was no conflict on this poin
The speed sheet was introdnced. This showed a rate c
speed of 40 miles an hour at the time of the accident, Th
rate may therefore be regarded as established as the actu
rate of speed. A speed sheet is a mechanical device for r
cording the exact rate of speed of trains on railroads. Und
the undisputed facts and circumstances of this case, was th
running of this train, so made up and on such a track, at
rate of speed of 40 miles an hour, an act of negligence c
carelessness? There can be but one answer to this questio
under the evidence in this case: No negligence or careles
ness has been shown. Hence there was nothing in the ev
dence to support a verdict for the appellee, and the cou
should have directed the jury to return a verdict for th
defendant, the appellant in this court. The practice of d
recting verdicts is a departure from earlier usages, and
has been of slow development. The reluctance of the cour
to invade the province of the jury by directing verdicts su
vives in the form of a rule, in force in some jurisdiction
known as the "scintilla of evidence rule," which is to th

ffect that a verdict may be directed only where there is no vidence, however slight, and no inference to be drawn rom the facts, which will support the opposite theory. If party has produced a scintilla of proof in his favor he is ntitled, where this rule prevails, to have the case submitted o the jury. This rule is applicable, even though it may ppear that the evidence is insufficient to support the verict, and that the latter must be set aside upon a motion or a new trial. 6 Enc. Law (N. S.) pp. 675-677, and numerus cases there cited. The later and prevailing doctrine, is hat a case may not be left to the jury unless there is evience which will warrant a verdict in favor of the party roducing it. Id. p. 678. This rule has been adopted by ourts of appeal in at least 21 states of the union, including rkansas, Illinois, Indiana, Iowa, Kansas, Massachusetts, Iichigan, Missouri, New York, Pennsylvania and Wisconin, and by all United States courts, including the supreme ourt of the United States. As far back as 14 Wall., the upreme court, in the case of Improvement Co. vs Munson, nnounced the new rule as follows: "Formerly it was held hat if there was what is called a scintilla of evidence in upport of a case the judge was bound to leave it to the ary, but recent decisions of high authority have established more reasonable rule, that in every case, before the evience is left to the jury, there is a preliminary question for he judge, not whether there is literally no evidence, but hether there is any upon which a jury can properly proed to find a verdict for the party producing it, upon whom e onus of proof is imposed." Improvement Co. vs Munn, 14 Wall. 443. The supreme court in 10 Wall. held: According to the settled practice in the courts of the nited States, it was proper to give the instruction, if it ere clear the plaintiff could not recover. It would have en idle to proceed further, when such must be the inevitle result. The practice is a wise one. It saves time and

costs; it gives the certainty of applied science to the results of judicial investigation; it draws clearly the line which separates the provinces of the judge and the jury, and fixes where it belongs the responsibility which should be assumed by the court." Merchants' Nat. Bank vs State Nat. Bank, 10 Wall. 604. "The following statement of the law has been approved in many negligence cases: "The case should not be withdrawn from the jury unless the conclusion followed, as a matter of law, that no recovery could be had upon any view which could be properly taken of the facts the evidence tended to establish." Dunlap vs Railroad Co. 130 U. S. 649, 9 Sup. Ct. 647; Railroad Co. vs Cox, 145 U. S. 593, 12 Sup. Ct. 905; Railroad Co. vs Kelley, 10 U. S. App. 537, 3 C. C. A. 589, and 53 Fed. 459; Railway Co. vs. Ellis, 10 U. S. App. 640, 4 C. C. A. 454, and 54 Fed. 481.' The test now most frequently employed in exercising the right to direct a verdict is whether a different verdict would need to be set aside as contrary to the evidence. If such is the case a verdict should be directed. This rule is followed in about 20 states of the Union by United States courts generally, and by the supreme court of the United States. See numerous cases cited in 6 Enc. Law (N. S.) pp. 681, 682. In a well considered case the Supreme Court held: "It is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor. Not whether, on all the evidence, the preponderating weight is in his favor —that is the business of the jury,—but, conceding to all the evidence offered the greatest probative force which, according to the law of evidence, it is fairly entitled to, is it sufficient to justify a verdict? If it does not, then it is the duty of the court, after a verdict, to set it aside and grant a new trial. Must the court go through the idle ceremony, in such a case, of submitting to the jury the testimony on which plaintiff relies, when it is clear to the judicial mind

that, if the jury should find a verdict in favor of plaintiff that verdict would be set aside and a new trial had.   Such a proposition is absurd, and accordingly we hold the true, principle to be that if the court is satisfied, conceding all the inferences which the jury could justifiably draw from the testimony, the evidence is sufficient to warrant a verdict for the plaintiff, the court should say so to the jury." Pleasants vs Fants, 22 Wall. 116.   In Minnesota it is held that a verdict may be directed "at the close of the whole case, though the plaintiff's evidence, standing alone, would justify submitting the case to the jury, where the defendant's evidence, so fully and satisfactorily explains it away, or so overwhelms it that there is no bona fide question of fact upon which a verdict for the plaintiff could be permitted to stand."   Giermann vs Railway Co., 42 Minn. 5; 43 N. W. 483.   In New York it is said that "to warrant an unqualified direction at the trial in favor of the one or the other party, the evidence must either be undisputed, or there must be such a preponderance that, should the jury find against it, a new trial would be granted for that reason." Rich vs Rich, 16 Wend. 663; Goodrich vs Walker, 1 Johns Cas. 251; Rudd vs Davis, 3 Hill 287; Id. 7 Hill 529; Carnes vs Platt, 1 Sweeney 140; People vs Board of Police, 35 Barb. 651; Dwight vs Insurance Co., 103 N. Y. 341; 8 N. E. 554; Linkauf vs Lombard, 137 N. Y. 417; 33 N. E. 472; Dodge vs Gaylord, 53 Ind. 365; Peet vs Insurance Co., 1 S. D. 462; 47 N. W. 532.   It is error for the court to refuse to direct a verdict in a proper case.   Railroad Co. vs Jones, 95 U. S. 439; Kresanowski vs Railroad Co., 18 Fed. 229; Conners vs Railway Co., 74 Iowa 383; 37 N. W. 966.   Appellant's motion, that the court should direct a verdict in its favor, should have been granted.   It was error for the court to refuse it.   The judgment of the court below is reversed, and case remanded, with direction to set aside the verdict, and grant a new trial.

CLAYTON, THOMAS and TOWNSEND, JJ., concur.

*Marginal note:* Duty of Court to direct verdict.